# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DEANNA SUE PAINTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 13-3002 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

This is an action pursuant to the Rehabilitation Act, 29 U.S.C. § 791 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.

Pending is the Motion of Defendant Illinois Department of Transportation for Summary Judgment.

In her amended complaint, Plaintiff Deanna Painter asserted claims for unnecessary medical examinations under 42 U.S.C. § 12112(d)(1)(2),

disability discrimination under § 12112(a), and retaliation for filing a charge of disability discrimination.   Because the Plaintiff has withdrawn her disability discrimination and retaliation claims, the only pending claim is for unnecessary medical examinations.   The Plaintiff asserts the medical examinations were not "job-related and consistent with business necessity," as required by the ADA and the Rehabilitation Act's incorporation of the ADA remedies

## I. FACTS

### A. Background

On September 1, 2010, Plaintiff Deanna Painter was assigned to a position of Office Administrator at Traffic Safety, a division of the Illinois Department of Transportation ("IDOT").

The Defendant alleges that in the Spring of 2011, Mike Stout, Director of Traffic Safety at IDOT, became aware of an incident involving the Plaintiff and Amber Biermann during which the Plaintiff loudly accused Biermann of prank calling her at the office.   The Plaintiff disputes this on the basis that Stout testified at his deposition that he had no recollection of

the Plaintiff.  Stout was shown a document regarding the Plaintiff that he had prepared.  He testified it was the first time he had seen the document in years and did not remember it.  In his affidavit, Stout states that he was shown several documents by the Defendant's counsel which have refreshed his recollection.   The documents include statements from 2011 that were written by other employees at Traffic Safety detailing incidents with the Plaintiff as well as a memorandum Stout wrote on or around May 4, 2011 to Marie Malek-Robinson, explaining the safety concerns he had with the Plaintiff's employment.   Malek-Robinson is the Manager of the Employee Assistant Program at IDOT and Coordinator of Fit-for-Duty Examinations of IDOT employees.   Stout states that prior to the Plaintiff's April 2011 administrative leave, he became aware of incidents between the Plaintiff and other employees.

The Plaintiff admits that before her first leave, she was having difficulties with certain co-workers including Cindy Titus, Susan Nevitt, Isabel Ziogas and Amber Biermann.

On or around April 4, 2011, when the Plaintiff was first placed on administrative leave, Stout instructed Tom Kirk, Traffic Safety's Personnel Manager, to conduct an investigation about the incident.  In his affidavit, Kirk states that he learned of other witnesses to the incident and interviewed them as well.  After each interview, Kirk instructed the witnesses to submit a written statement to him.  Stout states he reviewed the statements gathered by Kirk and made the decision, in conjunction with Labor Relations and the Finance and Administrative Division, to put the Plaintiff on paid administrative leave.  The leave began on April 14, 2011. The Plaintiff disputes the allegation based on Stout's lack of recollection.

The statements taken by Kirk, between April 5, 2011 and April 14, 2011, were provided to Marie Malek-Robinson, the Fit-For-Duty Coordinator at IDOT.  Typically, when Malek-Robinson receives statements from a unit of IDOT, she submits the statements to IDOT's fit-for-duty physician.  The physician then makes the decision as to whether a fit-for-duty exam of the employee is necessary.

B. Plaintiff's initial fit-for-duty exams

In this case, Malek-Robinson provided David Fletcher, M.D., with the statements given to her by Kirk, and Dr. Fletcher determined that a fit-for-duty exam was necessary.  On April 22, 2011 Dr. Fletcher, following a fit-for-duty exam of the Plaintiff, submitted a report to IDOT finding the Plaintiff fit for duty but recommending a reevaluation of the Plaintiff in 45 days for continued observation, based on the Plaintiff's supervisor's observation of mood swings and her fast pressurized speech during his evaluation.  Malek-Robinson also attended the fit-for-duty examination. Dr. Fletcher's April 22, 2011 report does not indicate that he reviewed any employee statements in making his determination that Plaintiff was fit-for-duty.

During the Plaintiff's administrative leave but before her first fit-for-duty exam, employees continued to come to Mike Stout and Tom Kirk to describe incidents with the Plaintiff.  Although the Plaintiff disputes the allegation based on Stout's lack of recollection, Kirk states that five to seven

employees talked to him about problems and issues they were having with the Plaintiff.

After Dr. Fletcher determined that Plaintiff was fit for duty, Kirk reached out to Marie Malek-Robinson who instructed him to gather more statements from the employees who had approached him after the Plaintiff went on administrative leave.  This second set includes statements from seven different employees and is generally more detailed than the first set. The employees describe the Plaintiff's outbursts and habit of walking around the office while talking to herself.  Many of the employees expressed fears for their safety, that they were afraid of being alone with the Plaintiff in this office and that they feared she might become physically violent.

On May 4, 2011, Stout wrote a memo to Marie Malek-Robinson detailing his concerns for his employees' safety if he were to return the Plaintiff to work at Traffic Safety.  Based on a review of the new statements from employees, both Stout and Kirk believed that employees felt genuinely threatened by the Plaintiff and that Plaintiff's continued employment would be a security risk.  Although the Plaintiff disputes this based on Stout's

6

alleged lack of recollection, Kirk's affidavit also supports the assertion.  Kirk states that two or three employees were being escorted by security guards to their cars at the end of the day while the Plaintiff was on administrative leave because they were fearful of the Plaintiff approaching them while they left work.

The Plaintiff admitted at her deposition that she had issues with Traffic Safety employees Amber Biermann, Susan Nevitt, Steve Esslinger, Isabelle Ziogas, JoAnn Ragland, Julie Cowgill, Cindy Clasing, Courtney Bee, Debbie Trepainer, Joan Egizii and Colleen Moore.

After receiving the second set of statements from employees, Malek-Robinson forwarded the statements to Dr. Fletcher.  Malek-Robinson testified that "the decision as to whether Deanna Painter needed a fit-for-duty examination would have been done by the medical doctor."  On July 18, 2011, the Plaintiff saw Dr. Fletcher for a fit-for-duty second exam. Following his second exam, Dr. Fletcher stated that he "reviewed additional documentation that shows disturbing inter-personal skills." Dr. Fletcher did not make a fit-for-duty finding at this time.  He deferred such a finding

pending testing by Dr. Karen Lee, Ph.D., a psychologist.  Dr. Fletcher also expressed a concern that Plaintiff might be bi-polar.

In August 2011, the Plaintiff saw Dr. Karen Lee.  Although Dr. Lee authored a report following her exam of the Plaintiff, Dr. Lee retained the Plaintiff as a patient thereafter.  The Plaintiff testified she understood that by retaining the Plaintiff as a patient, Dr. Lee created a conflict of interest and IDOT could no longer rely on her report.  IDOT did not receive a copy of Dr. Lee's report until litigation began in this matter.

C. Return to work and transfer to Day Labor

On September 26, 2011, the Plaintiff was returned to work and, on October 1, 2011, the Plaintiff was transferred to Day Labor (another division of IDOT) as an office administrator.  At Day Labor, the Plaintiff's supervisor was Stuart Hunt.  On November 18, 2011, the Plaintiff was given an oral reprimand by Hunt for keeping an extensive and detailed log of her co-workers' actions and conversations.  The Plaintiff made at least one entry in her log every day between September 26, 2011 and October 27, 2011.  During the last week of the Plaintiff's log, the Plaintiff made

several entries per hour.   The Plaintiff's purpose for the log was to "document every single thing that was said to [her] so [she] could try to figure out why [she] was put on leave."   The Plaintiff acknowledged that no one in her new division, Day Labor, made the decision to put her on paid administrative leave while she was at Traffic Safety.   The Plaintiff's log contained descriptions of conversations between co-workers that she overheard; the Plaintiff believed that co-workers would have conversations near her on purpose to make sure she overheard them.   The Plaintiff used work time to complete her log.

The Defendant asserts that, during this time period, Hunt began receiving reports from co-workers complaining of incidents with the Plaintiff.   The Plaintiff admits having issues with Michelle Kelley, who the Plaintiff claims was her only co-worker in Day Labor.   The Plaintiff also had issued with Lori Perry but claims any such conflict is immaterial because she did not perform any employment duties with Perry.

Stuart Hunt consulted with Labor Relations regarding the Plaintiff. Labor Relations recommended that Hunt gather and review statements from

the employees making the reports about the Plaintiff's behavior.   Hunt

gathered statements and sent them to Ryan Amerson in Labor Relations.

The Defendant alleges that during this period, around October 31,

2011 to November 28, 2011, Hunt began receiving numerous emails from

the Plaintiff, often during the evening and in the middle of the night.   The

content of the emails was often not work-related and nonsensical.   The

Plaintiff denies that the emails were not work-related.   In one email, sent to

Hunt at 8:00 p.m. on October 30, 2011, the Plaintiff discussed several

individuals unknown to Hunt.   In one particular paragraph of this email, the

Plaintiff wrote:

> I didn't talk about God their [sic] either – other than the one
> time Mike Fitzgerald asked me what I was listening to and I said
> a Christian radio station talking about blended families.   As a
> matter of fact, the [sic] who happens to be Barb Whitlow's
> daughter.   Isabel, for whatever reason one day told me that her
> mom works at the Marian Center downtown.   I told her I had
> just bought a cross necklace there a couple of months back.   It's
> a Catholic store.   Also, she told me her little brothers and sisters
> had gone to Little Flower.   I said I had gone to Little Flower
> from K-8 and sent my kids there for a little while but couldn't
> afford the entire time.

The Plaintiff testified that Mike Fitzgerald was a co-worker at Traffic Safety

with whom she had once had a conversation about Christian Radio.

Months later, at Day Labor, the Plaintiff overheard co-workers Lori Perry and Michelle Kelly talking about exorcisms.  The Plaintiff believed it was a possibility her co-workers might have talked to Fitzgerald, found out about their earlier conversation about Christian Radio, and purposely brought up Exorcism in a conversation near the Plaintiff to make fun of her.

During this time period, Hunt began recording his own interactions with the Plaintiff.  At some point, after submitting statements as well as his own documentation of interactions with the Plaintiff to Ryan Amerson of Labor Relations, Amerson recommended that Plaintiff go on paid administrative leave.  The Plaintiff testified that prior to this administrative leave, things were going poorly with co-workers.  After consulting with his supervisor, Rich Telford, Hunt decided to accept Amerson's recommendation to put the Plaintiff on paid leave.

According to his affidavit, Hunt's decision was based on the Plaintiff's log, emails that Plaintiff had sent to him and other employees, personal conversations he had with the Plaintiff and his review of the Plaintiff's

statements.  Moreover, Hunt believed that Plaintiff was a safety concern to the office.  In addition, two of his employees, Lori Perry and Michelle Kelly, expressed to him that they believed the Plaintiff was violent and dangerous.[1]

D. Additional fit-for-duty exams and Plaintiff's administrative leave

On November 23, 2011, the Plaintiff was placed on paid administrative leave.  On December 2, 2012 and December 16, 2012, the Plaintiff saw Terry Killian, M.D., for a fit-for-duty exam.  Dr. Killian ultimately concluded that, although comments from coworkers and supervisors suggest substantial behavioral and psychiatric illness, the Plaintiff was psychiatrically fit for duty.  Malek-Robinson did not pass Dr. Killian's report on to Painter's managers.

On January 17, 2012, the Plaintiff returned to her position at Day Labor at IDOT.  Employees, including Michelle Kelly, began submitting statements about the Plaintiff's behavior in the work place.  Hunt shared the statements with Labor Relations.  The Plaintiff notes that Kelly was the

_____

[1]The Plaintiff disputes these allegations on the basis that Hunt did not testify as to this.  However, the Court notes that affidavits may be cited in support of a summary judgment motion.

12

only employee with whom she worked under Hunt.  At the end of March 2012, Hunt gave the Plaintiff a written reprimand for being argumentative.

On April 20, 2012, the Plaintiff sent an email to her union representative, Tim Lynch, which said in part, "for the record, the clock in the small conference room being set to 4:30 PM when it was only 4:00 PM – that is a telltale sign for me.  It told me everything I needed to know. Thanks."  Lynch responded that he did not understand what the reference to the clock meant and that he thought the battery was dead.  The Plaintiff responded to Lynch, "Something's dead alright–however, I prefer to be 'a lady' and not say what I think is dead."  The Plaintiff included a smiley face emoticon at the end of the sentence.

The Plaintiff's email was treated as a potential threat by IDOT and the Illinois State Police were contacted.  The Plaintiff alleges the email contained no threat.

On April 24, 2012, the Plaintiff was placed on paid administrative leave.  On May 8, 2012, the Plaintiff attended a fit-for-duty examination with Dr. Killian.  Dr. Killian had told the Plaintiff on May 5, 2012 that he

13

"expected to find her fit for duty."  In June 2012, however, Dr. Killian submitted his report to IDOT, concluding that Plaintiff was "psychiatrically unfit for duty as a result of paranoid thinking (caused by either paranoid personality disorder or Delusional Disorder) and the disruptive behavior which results from her paranoia.  Dr. Killian continued "that it is not her paranoia, per se, that makes her unfit, but rather the highly disruptive behavior that is resulting from her paranoia."

Malek-Robinson did not send Dr. Killian's report to Stuart Hunt.  She simply told Hunt that Dr. Killian had found the Plaintiff unfit for duty.

The Plaintiff was examined by Stephen Dinwiddie, M.D., Professor of Psychiatry at the Feinberg School of Medicine at Northwestern University, who was retained by the Plaintiff's counsel.  After examining the Plaintiff, Dr. Dinwiddie believed she was fit to work.  The Defendant contends that any outside examination and the results thereof are not relevant to the Plaintiff's only claim that her IDOT fit-for-duty exams were not a business necessity.  Additionally, Dr. Killian's 2014 and 2015 examinations of the Plaintiff are irrelevant.

14

The Plaintiff was hired for employment at the Illinois Department of Human Services – formerly the Department of Public Aid – as a caseworker on April 1, 2014.  She completed her year of probation and was certified. The Plaintiff is a caseworker who responded to requests by email or telephone on what benefits are available.

In an Order entered on September 21, 2015, the Court concluded that Dr. Killian's fourth medical exam in July 2015 is not subject to discovery and is inadmissible.

The Plaintiff asserts that the fit-for-duty exams were not "job-related and consistent with business necessity," as required under the statutes.  The Defendant seeks summary judgment on the Plaintiff's claim for unnecessary medical examinations.

## II. LEGAL DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  The

Court construes all inferences in favor of the non-movant.  *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion.  *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in her favor.  *See id.*

B. Fit-for-Duty Exams as a Business Necessity

(1)

The ADA states in pertinent part:

**(A) Prohibited examinations and inquiries**

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

16

## (B) Acceptable examinations and inquiries

> A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.

42 U.S.C. § 12112(d)(4)(A-B).  The Seventh Circuit has stated:

> The EEOC enforcement guidelines state that a medical examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition.  We have acknowledged that inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the public at large.

*Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 565 (7th Cir. 2009)

(internal quotation marks omitted).

The Plaintiff contends that the Court should adopt the Sixth Circuit rule and, pursuant to *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619 (6th Cir. 2014), require identification of the employee making the decision for the medical examination and the objective evidence that the employee threatens a vital business function.  *See id.* at 623.

17

Although the court in *Kroll* states that "the individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business," *see id.*, the court does not affirmatively state that the decision-maker must be identified.  Even assuming that *Kroll* stands for the proposition that identification is required, the Court is not persuaded by the Sixth Circuit's analysis given that the statutory language has no such requirement and the Seventh Circuit has not adopted such a rule.

The Defendant contends that each of the fit-for-duty exams was job-related and consistent with business necessity.  The April 22, 2011 exam followed an incident involving the Plaintiff and Amber Biermann.  The Plaintiff loudly accused Biermann of prank calling her at the office.  Other employees stated that Plaintiff had accused them of spying on her at work.  The Plaintiff admitted having issues with several employees.  Dr. Fletcher found the Plaintiff fit for duty but recommended a re-evaluation in 45 days.

Employees continued to submit statements concerning the Plaintiff's behavior.  Some employees reported being worried about being alone with

18

the Plaintiff in the office.  In a May 4, 2011 memo to Marie Malek-Robinson, Mike Stout discussed his concerns for his employees' safety if the Plaintiff returned to work.  The Plaintiff acknowledged having issues with more than ten employees.  Based on a review of the statements, Both Stout and Tom Kirk stated they believed that employees felt threatened by the Plaintiff.

Marie Malek-Robinson forwarded the statements to Dr. Fletcher, who on July 18, 2011 saw the Plaintiff for a second fit-for-duty exam.  Although he did not make a fit-for-duty finding, Dr. Fletcher stated in his report that he "reviewed additional documentation that shows disturbing inter-personal skills" and referred the Plaintiff to Dr. Lee.

The Plaintiff returned to work in September 2011 and began working at Day Labor in October 2011.  The Plaintiff kept a daily log of co-worker interactions and overheard conversations.  The Plaintiff reported having issues with Michelle Kelly and Lori Perry and her supervisor, Stuart Hunt. Hunt reported receiving strange emails from the Plaintiff that were not work-related.   Hunt submitted employee statements and his own

documentation to Ryan Amerson, who recommended that Plaintiff be placed on leave. After talking to his supervisor, Rich Telford, Hunt accepted Amerson's recommendation based on several considerations, including the Plaintiff's log, emails she had sent, personal conversations with the Plaintiff and his review of employee's statements. Hunt believed the Plaintiff was a safety concern.

On November 23, 2011, the Plaintiff was placed on administrative leave. On December 2 and 16, 2011, the Plaintiff saw Dr. Killian for a fit-for-duty exam. Dr. Killian ultimately concluded that, although the comments and supervisors might suggest substantial behavioral and psychiatric illness, the Plaintiff was psychiatrically fit for duty.

The Plaintiff returned to work on January 17, 2012. In April 2012, the Plaintiff sent an email to Tim Lynch, a union representative, regarding the clock being changed. When Lynch responded that he thought the battery was dead, the Plaintiff replied "something's dead alright – however, I prefer to be a 'lady' and not say what I think is dead," and the Plaintiff added a smiley face emoticon.

IDOT interpreted the Plaintiff's email as a potential threat and she was placed on leave on April 24, 2012. On May 8, 2012, the Plaintiff saw Dr. Killian for a fit-for-duty exam. In June 2012, Dr. Killian submitted a report, concluding that Plaintiff was "psychiatrically unfit for duty as a result of paranoid thinking (caused by either paranoid personality disorder or Delusional Disorder) and the disruptive behavior which results from her paranoia."

(2)

The record establishes that prior to each leave and subsequent exam, multiple employees raised concerns about the Plaintiff's behavior in the workplace. A number of employees felt unsafe around the Plaintiff. Certain employees did not want to be alone around her and some were afraid to walk to their cars at night. The Plaintiff shouted at her co-workers, talked in a fast-paced manner and talked to herself at times. The Plaintiff's supervisors considered the employees' statements and their own interactions before determining that Plaintiff was a security risk to the other employees.

The plaintiff in *Coffman* was a firefighter.   578 F.3d at 561.   A number of firefighters expressed concerns about the plaintiff's well-being, noting she had difficulty socializing and asking for help, was "often alone or withdrawn" and seemed "defensive" for "no legitimate reason."   *See id.* at 562.  The plaintiff was sent for a "fitness for duty psychological evaluation." *See id*.   The psychologist determined that although the plaintiff was unhappy with some aspect of her work life, she was not suffering from any psychological disorder.   *See id*.   The doctor recommended therapy and a light duty assignment.   *See id*.

The therapist found nothing that would prevent the plaintiff from doing her job and recommended another fitness for duty evaluation.  At the second exam, the second doctor found the plaintiff to be unfit for duty after observing her "acting out in an immature and hostile manner" and observing her to be "extremely resistant."  *Id*.

The plaintiff was evaluated one month later by another doctor, who found that she was prepared to return to light-duty status for three or four

weeks.  *See id.*  Five weeks later, the same doctor found the plaintiff to be fit for active duty.  *See id.*

The plaintiff in *Coffman* claimed that no objective evidence supported the defendants' decision to refer her for the fit-for-duty exams.  *See id.* at 565.  The court observed that plaintiff's well-being was essential not only to her safety but to the safety of the public at large and, therefore, the department had a "particularly compelling interest in assuring that she was both physically and mentally fit to perform her duties."  *Id.*  The court cited examples of multiple firefighters expressing concern about the plaintiff's behavior and determined that the fit-for-duty exams were consistent with a business necessity.  *See id.* at 565-66.

The Defendant's decision here in directing the Plaintiff to undergo fit-for-duty exams is based on some of the same factors as in *Coffman*.  Specifically, it was based on the statements of co-workers about the Plaintiff's behavior and the observations of supervisors.  Each leave and fit-for-duty exam was based on some new incident of behavior.  Generally, more than one individual complained about the Plaintiff's behavior.  The

decision to act was consistent with business necessity.

The Plaintiff states that a jury could conclude that the Defendant was using the mental health examination process to attempt to preclude the Plaintiff from working after the Defendant lost the grievance pertaining to the Plaintiff's discipline under the union contract.  That discipline was for the Plaintiff keeping notes of her encounters with other employees which, the Plaintiff contends, is exactly what employees such as Michelle Kelly did. Additionally, the Plaintiff claims that the Reprimand of April 23, 2012 was for "unprofessional tone," without any specification of what was said or what about the tone warranted discipline.  The Plaintiff contends these matters are not vital to the operation of IDOT.  Instead, they are petty workplace disputes that occurred because the Plaintiff's supervisor, Stuart Hunt, was consistently deciding against her.

The Court disagrees.  As previously noted, the Defendant gathered significant amounts of information before directing the Plaintiff to receive a mental health examination.  The Plaintiff has not challenged the accuracy of this information or rebutted the statements of co-workers.  The record

establishes that due to a number of different occurrences, other employees and supervisors had legitimate concerns that Plaintiff's behavior could pose a threat.

Regarding the email exchange about the stopped clock and the Plaintiff's statement, "Something's dead alright – however, I prefer to be a 'lady' and not say what I think is dead," the meaning of that statement presumably is known only to the Plaintiff.  It may have been an attempt at humor as the Plaintiff testified.  However, it was not unreasonable for the Defendant to treat the email as a threat.  That led to the Plaintiff's May 8, 2012 fit-for-duty exam with Dr. Killian, after which he found her to be "psychiatrically unfit for duty."

The Defendant acted reasonably in taking action following that incident, just as it did in responding to other incidents by referring the Plaintiff to fit-for-duty exams.

Accordingly, the Defendant has established that the fit-for-duty exams were job-related and consistent with business necessity, given that the Defendant had a reasonable belief based on objective evidence that a

medical condition would impair the Plaintiff's ability to perform essential job functions or that the Plaintiff would pose a threat due to a medical condition.

(3)

The Plaintiff also contends that a jury could find there is evidence of doctor shopping on the part of the Defendant, in order to ensure that Plaintiff would be taken off work.  The Plaintiff notes that practice is prohibited in worker's compensation cases and in other contexts.

There is no basis to believe that the Defendant was doctor shopping. The Defendant sent the Plaintiff to Dr. Fletcher a second time in July 2011 after he previously found the Plaintiff to be a fit for duty in April 2011. Additionally, the Defendant sent the Plaintiff to Dr. Killian a second time in May 2012 after he had previously found her to be fit for duty in December 2011.

As the Defendant contends, if it actually had been doctor shopping, the Defendant would not have sent the Plaintiff back to either doctor after both doctors had previously found her to be fit for duty.  Rather, the

Defendant would have searched for another doctor in order to obtain the desired result.  Accordingly, there is no basis to find that Defendant was doctor shopping in order to ensure that Plaintiff would be removed from work.

(4)

The Plaintiff also alleges she suffered an adverse action of prohibited medical examinations and was off work from June 26, 2012 until April 1, 2014.  The Plaintiff contends that because the medical examination was not justified by business necessity, this constituted an adverse employment action given that the Plaintiff suffered a loss of employment and the associated compensation and benefits.

As the Court earlier found, the medical examinations were justified by business necessity.  Accordingly, the Plaintiff cannot show that she suffered the adverse action of prohibited medical examinations over the nearly two years when she was on disability leave without income.

Based on the foregoing, upon viewing the evidence in a light most favorable to the Plaintiff, there is a no genuine issue of material fact.  The

Defendant is entitled to summary judgment because IDOT had a business necessity for sending the Plaintiff to fit-for-duty exams.

## III. CONCLUSION

The Plaintiff has withdrawn her disability discrimination and retaliation claims.

Upon viewing the evidence in a light most favorable to the Plaintiff, the Court concludes there are no genuine issues of material fact and summary judgment is appropriate on the Plaintiff's claims for medical examinations. The Defendant's actions were based on legitimate concerns and its employees reasonably responded to the situation which they encountered. Each fit-for-duty exam was job-related and consistent with business necessity, as required under the ADA and Rehabilitation Act.

Ergo, the Defendant's Motion for Summary Judgment [d/e 58] is ALLOWED.

The final pretrial conference and trial settings are Canceled.

The Clerk will enter Judgment in favor of the Defendant and against

the Plaintiff.

Upon entry of Judgment, the Clerk shall terminate this case.

ENTER: July 20, 2016

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge